CENTURY 21 REAL ESTATE LLC,

        Plaintiff,

-vs-                                    **Case No. 6:08-cv-1890-Orl-28KRS**

PERFECT GULF PROPERTIES, INC.,
PERFECT GULF PROPERTIES I, LLC,
HUDSON MORGAN INVESTMENTS,
INC., T&W MANAGEMENT, INC.,
DOUGLAS MCPHERSON, ROBERT C.E.
WILLIAMS, JIMMY AVIRAM, MICHAEL
WEBER, CLIFFORD R. MORGAN II,
ARTHUR J. HUDSON, and PAM
WOLTERS,

        Defendants.

_____

# ORDER

    Century 21 Real Estate LLC ("Plaintiff") filed the instant action in November 2008, bringing claims of, inter alia, trademark infringement and breach of contract against two of its former franchisees and several other defendants. The case is now before the Court on Plaintiff's Motion for Partial Summary Judgment (Doc. 88), in which Plaintiff seeks summary judgment against three of the Defendants on two of the twelve counts of the Second Amended Complaint (Doc. 75). These three Defendants—Robert C.E. Williams, Jimmy Aviram, and Michael Weber (collectively "the Guarantor Defendants")[1]—have filed a

_____

[1] In addition to the Guarantor Defendants—to whom the motion now before the Court pertains—eight other parties were initially named as Defendants in this case. The claims against five of the other Defendants—Hudson Morgan Investments, Inc., Arthur J. Hudson,

memorandum (Doc. 96) in opposition to Plaintiff's motion, and the motion is ripe for ruling. Having considered the parties' submissions and applicable law, the Court concludes that Plaintiff's motion shall be granted.

## I.  Background

Plaintiff, which maintains its principal place of business in New Jersey, describes itself in the Second Amended Complaint as "one of the largest real estate brokerage franchise systems in the United States."  (Doc. 75 ¶¶ 1 & 11).  From 1997 to 2005, Plaintiff entered into eighteen franchise agreements with Perfect Gulf Properties, Inc. ("PGP") and one franchise agreement with Perfect Gulf Properties I, LLC ("PGP I") for the establishment of nineteen Plaintiff-branded real estate brokerage offices in Florida.  Under the franchise agreements, which were essentially identical,[2] each franchise was for a term of ten years. (See, e.g., Franchise Agreement I, Ex. A to Doc. 75, ¶ 2; Franchise Agreement II, Ex. H to

---

Clifford R. Morgan II, Pam Wolters, and T & W Management, Inc.—have been dismissed. (See Docs. 34, 45, 47, 50, 51, & 62).  The claims against the other three Defendants—Perfect Gulf Properties, Inc., Perfect Gulf Properties I, LLC, and Douglas McPherson—have not been dismissed, and defaults have been entered against those Defendants. (See Docs. 41, 42, & 43).  On November 18, 2009, Plaintiff's Motion for Default Judgment (Doc. 86) against these three Defendants was denied without prejudice by the assigned magistrate judge, subject to renewal after the case is resolved against the Guarantor Defendants.  (Order, Doc. 98).

[2]As explained by Plaintiff's Senior Director of Financial Services, Jacqueline Bertet, the franchise agreements for the nineteen locations were "substantially the same in all material respects," though there were two general forms of franchise agreement.  (Bertet Decl., Attach. to Doc. 88, ¶¶ 4-5).  Seven of the offices were governed by an agreement in the form of what has been referred to as "Franchise Agreement I"—for example, Exhibit A to Doc. 75—and the other twelve offices were governed by agreements in the form of "Franchise Agreement II"—for example, Exhibit H to Doc. 75.  All nineteen of the franchise agreements are attached to the Second Amended Complaint.  (Exs. A through S to Doc. 75).

Doc. 75, ¶ 1.5).  During the franchise terms, PGP and PGP I[3]—both of which did business

under the fictitious name "Century 21 Sunshine Realty"[4]— were permitted to use Plaintiff's

trademarks in connection with operation of the franchises.

The franchise agreements obligated PGP to make certain periodic payments to

Plaintiff, including a "royalty fee" of 6% of gross revenue and a national advertising fee

("NAF") of 2% of gross revenue; there was a monthly minimum for each of these fees.  (See

Franchise Agreement I ¶¶ 8-9; Franchise Agreement II ¶¶ 7-8).  The franchise agreements

were subject to termination by Plaintiff for, inter alia, failure of the franchisee to make

payments to Plaintiff as required.  (See Franchise Agreement I ¶ 17; Franchise Agreement

II ¶ 16).

The Guarantor Defendants describe themselves as "silent investors" in PGP, which

was operated without input from them by co-Defendant Douglas McPherson.[5]  Each of the

Guarantor Defendants executed personal guaranties "of payment and performance" of all

nineteen franchises.  (See, e.g., Ex. A to Doc. 75 at 43-44).[6]  The guaranties that each

Guarantor Defendant executed provided in part:  "Each guarantor does hereby, jointly and

severally, to the extent herein provided, guaranty to [Plaintiff] the prompt payment and

---

[3]For ease of reading, later references in the Order to "PGP" shall be understood to include PGP I where applicable.

[4](See Second Am. Compl. ¶¶ 2-3; Mem. in Opp'n to Mot. for Summ. J., Doc. 96, at 2).

[5]As noted earlier, McPherson has not made an appearance in this case, and a Clerk's Default has been entered against him.

[6]The personal guaranties are the last two pages of each franchise agreement.

performance when due of all obligations of Franchisee under that certain Franchise Agreement bearing even date hereof, including any renewal, replacement or modification of said Franchise Agreement . . . ." (Id. at 43). Additionally, the guaranties stated that "[t]he obligation of each Guarantor hereunder is an absolute and unconditional obligation[] and constitutes a guaranty of payment and performance." (Id.).

In September 2006, each of the Guarantor Defendants executed a "Development Advance Promissory Note" ("DAN") as co-makers, with PGP as the maker. (DAN, Ex. T to Doc. 75). The DAN evidenced a forgivable loan from Plaintiff to PGP in the amount of $600,000; under its terms, the Guarantor Defendants and PGP promised to repay the $600,000—without interest—on a date approximately eight years later, but if PGP was not in default under any franchise agreements and if PGP's franchise offices met a certain threshold level of revenues each year, one ninth of the DAN principal would be forgiven each year. In other words, so long as PGP's franchises met the revenue threshold and remained in good standing for nine years, the entire DAN principal would be forgiven. The DAN also provided, however, that Plaintiff could declare PGP and the Guarantor Defendants in default and accelerate the unpaid principal "upon termination or expiration of any agreement between [PGP] and [Plaintiff] or any of [Plaintiff's] related companies, including, but not limited to, any of the Franchise Agreements." (DAN at 2). It is undisputed that $426,303.94 of the $600,000 DAN principal was applied toward franchise fees that PGP owed Plaintiff at the time of the funding of the DAN, and only $173,696.06 was advanced by check to PGP.

Also in September 2006, in connection with the DAN, an "Addendum to Franchise Agreement" was executed. (Bertet Decl. ¶ 13; Ex. 1 to Bertet Decl.). This Addendum,

signed by the Guarantor Defendants and by McPherson, extended the expiration date of each franchise by ten years, so that each franchise term would expire on September 15, 2016. (Ex. 1 to Bertet Decl.).

On February 20, 2008 and May 21, 2008, Plaintiff sent letters to each franchise location advising that the franchise was in default because of nonpayment of fees when due and that Plaintiff intended to terminate each agreement unless the defaults were cured. (Notice of Default Letters, Exs. V & W to Doc. 75). The defaults were not cured, and in July 2008 Plaintiff sent letters advising that it was exercising its termination rights and demanding payment of outstanding fees. (Termination Letters, Ex. X to Doc. 75).[7]

The outstanding amounts have not been paid to Plaintiff, and on November 6, 2008, Plaintiff filed this lawsuit. (Compl., Doc. 1). In the Second Amended Complaint (Doc. 75), Plaintiff alleges twelve counts, naming as defendants PGP, PGP I, McPherson, and the Guarantor Defendants; Plaintiff now seeks summary judgment on counts VII (breach of contract—the DAN) and VIII (breach of contract—guaranty) against the Guarantor Defendants only. By its motion, Plaintiff seeks to establish the liability of the Guarantor Defendants for unpaid franchise fees of approximately $800,000 and the unpaid DAN principal of $600,000.[8] Plaintiff's Senior Director of Financial Services, Jacqueline Bertet,

---

[7]The Guarantor Defendants deny seeing any of these letters prior to this lawsuit; they initially alleged lack of notice as a defense to the claims against them, but they now concede that notice was sent to each franchise location, which was, under the terms of the franchise agreements, the proper, approved location at which notice was to be given. The Court presumes that McPherson received the letters but did not tell the Guarantor Defendants about them or about PGP's failure to remain current on its franchise fees.

[8]Plaintiff also sought liquidated damages of over $6 million in its summary judgment

states in her declaration that if Plaintiff's motion regarding counts VII and VIII is granted, Plaintiff "will dismiss its remaining claims with prejudice." (Bertet Decl. at 2 n.1).

## II.  Discussion

### A.  Summary Judgment Standards

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  However, summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  "'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on

_____

motion. However, on February 16, 2010, Plaintiff filed its "Notice of Withdrawal of Liquidated Damages Claim from its Motion for Summary Judgment" (Doc. 105). Accordingly, the issue of liquidated damages is not addressed in this Order.

speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.'  Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the [factfinder] or whether it is so one-sided that one party must prevail as a matter of law.'"  <u>Sawyer v. Southwest Airlines Co.</u>, 243 F. Supp. 2d 1257, 1261 (D. Kan. 2003) (quoting <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988), and <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986)); <u>see also</u> <u>LaRoche v. Denny's, Inc.</u>, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

### B.  The Merits of Plaintiff's Motion

The Guarantor Defendants do not dispute that they executed personal guaranties of the franchise agreements; that they executed the DAN;; or that Plaintiff properly terminated the franchise agreements due to nonpayment of franchise fees.  However, the Guarantor Defendants assert several defenses to Plaintiff's claims and urge that Plaintiff's motion for summary judgment should be denied because of factual issues remaining as to those defenses.[9]  As set forth below, the Guarantor Defendants' contentions are rejected.

---

[9]In its motion for summary judgment, Plaintiff asserts arguments as to all of the affirmative defenses asserted by the Guarantor Defendants with regard to Counts VII and VIII in their Answer to the Second Amended Complaint, (<u>see</u> Doc. 76 at 29-35):  waiver; laches; estoppel; failure to perfect security interest; prior breach by Plaintiff; failure to mitigate; accord and satisfaction; lack of proper notice; transfer of ownership interest; and unenforceability of the liquidated damages clause.  However, in their response memorandum (Doc. 96), the Guarantor Defendants assert only waiver, laches, estoppel, failure to mitigate, and unenforceability of the liquidated damages clause.  In the Joint Pretrial Statement, the Guarantor Defendants state that they withdraw the other affirmative defenses.  (Doc. 101 at 13-14).    Only  the  defenses  argued  in  the  Guarantor  Defendants'  response

1.  Applicable Law

The parties are in agreement that the counts at issue in the summary judgment motion—Counts VII and VIII—are governed by the law of New Jersey.[10]

2.  Issues of Fact as to Affirmative Defenses Generally

The Guarantor Defendants assert in their opposition memorandum that their affirmative defenses of waiver, estoppel, laches, and failure to mitigate are not properly resolvable at summary judgment because "[u]nder New Jersey law, the validity of these particular affirmative defenses is a question of fact for the fact finder."  (Doc. 96 at 7).  However, the Court rejects out of hand the contention that a fact issue is always present; it is incumbent upon the Guarantor Defendants to point to evidence creating a genuine issue of material fact as to an affirmative defense, and they cannot avoid summary judgment by merely asserting that summary judgment is never proper on these issues.

3.  Count VII—Breach of Contract:  the DAN

The Guarantor Defendants do not dispute that they executed the DAN or that pursuant to the DAN Plaintiff funded $600,000 to PGP.  However, they maintain that they are not liable for repayment of the DAN because they were misled as to the purpose of the DAN. The Guarantor Defendants assert that Plaintiff failed to inform them that PGP was not meeting the franchise performance conditions and could not meet the franchise performance

---

memorandum—except with regard to the liquidated damages clause, as Plaintiff has withdrawn that issue from its summary judgment motion—are addressed herein.

[10]The franchise agreements, the DAN, and at least some of the guaranties provide that New Jersey law applies.  (See, e.g., Ex. A to Doc. 75 ¶ 25A; Ex. H to Doc. 75 ¶ 22.7; id. at 42; Ex. T to Doc. 75 at 3).

conditions; they "assumed" when they signed the DAN that PGP was current on the fees it was obligated to pay to Plaintiff and that PGP was meeting performance conditions. In the view of the Guarantor Defendants, Plaintiff "violated the terms of the DAN" by funding the DAN even though PGP did not meet the pre-funding conditions. (Doc. 96 at 9). Additionally, Plaintiff allegedly acted improperly by not allowing all of the $600,000 in DAN funds to be used for expansion of PGP's franchises; instead, $426,303.94 of the $600,000 was used to pay down PGP's existing debt to Plaintiff, with only the balance of $173,696.06 paid to PGP. The Guarantor Defendants also assert that Plaintiff's conduct in promising this development money in exchange for a ten-year extension of the franchise terms was "reprehensible." (See Doc. 96 at 9).

The Guarantor Defendants' arguments about being misled by Plaintiff with regard to the DAN are unavailing. The Guarantor Defendants admit that they "assumed" at the time the DAN was executed that PGP was current on its obligations, and they attempt to blame Plaintiff for not telling them otherwise. However, the Guarantor Defendants acknowledge that they were not kept informed by Douglas McPherson as to PGP's status; McPherson merely asked them for money and to sign things from time to time, and they obliged.[11] Their

---

[11](See, e.g., Williams Dep., Doc. 79, at 41-42 ("I recall being asked to sign many documents. . . . I would just sign where I was told to sign."); Aviram Dep., Doc. 80, at 36-37 ("I trusted Douglas [McPherson] impeccably for years. . . . I thought I kn[e]w how to read people. I was wrong. But I trusted him. . . . I remember the facts, but I don't remember why I was such a sucker through the years."); id. at 68 (stating that he sometimes called McPherson inquiring about documents regarding the business, but there was always an excuse as to why documents were not available); id. at 27-28 (stating that when McPherson wanted money, "the picture was all rosy," meaning that McPherson always told him that business was good)).

information about the DAN, its purpose, and PGP's supposed compliance with pre-funding conditions came from McPherson, not from Plaintiff. (See, e.g., Aviram Dep., Doc. 80, at 58 ("I was told by Douglas McPherson that this money is going to come a hundred percent for us to expand.")). Thus, even if "being misled to its purpose" would relieve the Guarantor Defendants of their obligations under the DAN, there is no evidence that Plaintiff misled them; if they were misled by anyone, it was by McPherson. Moreover, the Addendum that contains the pre-funding conditions for the DAN does not state that Plaintiff could not fund the DAN if PGP was not in compliance with the pre-funding conditions; it instead says that Plaintiff was not obligated to fund it if PGP was not in such compliance. (See Addendum, Ex. 1 to Bertet Decl., at 1). Nothing in the Addendum, the DAN, or any other document that has been presented to the Court barred Plaintiff from waiving the pre-funding conditions and funding the DAN if it chose to.

The Guarantor Defendants assert two specific defenses with regard to the DAN: estoppel and failure to mitigate. They aver that Plaintiff should be precluded from asserting its right to enforce the terms of the DAN due to Plaintiff's conduct in connection therewith, and they contend that Plaintiff was the sole cause of its own damages with regard to the DAN because Plaintiff knew when it funded the DAN that PGP could not comply with the conditions of the DAN. These arguments, however, are without merit.

In their opposition memorandum, the Guarantor Defendants correctly state the law regarding estoppel. "Estoppel is 'an equitable doctrine, founded in the fundamental duty of fair dealing imposed by law . . . ." Casamasino v. City of Jersey City, 730 A.2d 287, 298 (N.J. 1999). "[T]o establish equitable estoppel, [the Guarantor Defendants] must show that

[Plaintiff] engaged in conduct, either intentionally or under circumstances that induced reliance, and that [the Guarantor Defendants] acted or changed their position to their detriment." <u>Knorr v. Smeal</u>, 836 A.2d 794, 799 (N.J. 2003).  However, the Guarantor Defendants cannot establish estoppel here because they did not deal with Plaintiff; they dealt with McPherson.  There is no evidence that Plaintiff dealt with the Guarantor Defendants unfairly or even dealt with them at all.  If the Guarantor Defendants relied on anyone, it was, by their own admissions, McPherson.  The events as recounted by the Guarantor Defendants themselves do not support application of the doctrine of estoppel against Plaintiff.  Thus, estoppel does not preclude the Guarantor Defendants' liability on the DAN.

The Guarantor Defendants also assert that Plaintiff failed to mitigate its damages with regard to the DAN.  They argue that Plaintiff "was the sole cause of its damages" because Plaintiff knew that PGP could not meet the conditions of the DAN.  Essentially, the Guarantor Defendants aver that Plaintiff should have avoided loss on the DAN by never funding the DAN in the first instance.

The doctrine of failure to mitigate damages, however, arises *after* a contract has been breached, not before.  <u>See</u> Black's Law Dictionary 1093 (9th ed. 2009) (defining "mitigation-of-damages doctrine" as "[t]he principle requiring a plaintiff, after an injury or breach of contract, to make reasonable efforts to alleviate the effects of the injury or breach"); <u>State v. Ernst & Young, L.L.P.</u>, 902 A.2d 338, 348 (N.J. Super. Ct. App. Div. 2006) ("'Once a party has reason to know that performance by the other party will not be forthcoming, he is ordinarily expected . . . to take such affirmative steps as are appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise.'" (quoting <u>Ingraham v.</u>

Trowbridge Builders, 687 A.2d 785, 791 (N.J. Super. Ct. App. Div. 1997))) (alteration in original).  No further damages have accrued to Plaintiff after the breach of the DAN; it is only seeking the DAN principal.

In sum, there are no issues of fact remaining with regard to the Guarantor Defendants' liability on the DAN or their affirmative defenses thereto.  Plaintiff is thus entitled to summary judgment on Count VII.

### 4.  Count VIII—Breach of Contract:  Guaranty

The Guarantor Defendants do not dispute that they executed personal guaranties of all nineteen franchise agreements between PGP and Plaintiff.  They nevertheless assert that they are not liable on the guaranties, raising three defenses:  waiver, laches, and failure to mitigate.

"Waiver is the voluntary and intentional relinquishment of a known right."  Knorr, 836 A.2d at 798.  "An effective waiver requires a party to have full knowledge of his legal rights and intent to surrender those rights.  The intent to waive need not be stated expressly, provided the circumstances clearly show that the party knew of the right and then abandoned it, either by design or indifference.  The party waiving a known right must do so clearly, unequivocally, and decisively."  Id. (citations omitted).

The Guarantor Defendants contend that Plaintiff waived its right to enforce the guaranties because PGP had been in default under the franchise agreements since 2006 and instead of terminating the agreements, Plaintiff continued to extend PGP's agreements and to allow PGP to acquire new franchises.  However, waiver is not supported by these facts.  There is no evidence of intentional waiver of the terms of the franchise agreements

-12-

or the guaranties by Plaintiff.  The defense of waiver is rejected.

The Guarantor Defendants also argue that the doctrine of laches bars enforcement of the guarantees.  Laches "is invoked to deny a party enforcement of a known right when the party engages in an inexcusable and unexplained delay in exercising that right to the prejudice of the other party."  Id. at 800.  "The key factors to be considered in deciding whether to apply the doctrine are the length of the delay, the reasons for the delay, and the 'changing conditions of either or both parties during the delay.'"  Id. (quoting Lavin v. Bd. of Educ., 447 A.2d 516, 519 (N.J. 1982)).

The Guarantor Defendants contend that Plaintiff had many opportunities to terminate the franchise agreements but it did not do so, instead extending the agreements, resulting in an increase in the value of the liquidated damages provision of the initial franchise agreements.  The Guarantor Defendants urge that they have been prejudiced by Plaintiff's failure to terminate the franchise agreements in 2006 or 2007.

This defense is not well-taken.  Plaintiff had the option, but not the obligation, to terminate the franchise agreements upon default by PGP.  Although there is evidence that PGP had been out of compliance at some point in 2006, Plaintiff sent notices of default in February 2008, sent notices of termination in July 2008 after providing an opportunity to cure, and filed this lawsuit in early November 2008.  It cannot be said that Plaintiff inexcusably or unreasonably delayed in exercising its termination rights.  Moreover, "[l]aches may only be enforced when the delaying party had sufficient opportunity to assert the right . . . and the prejudiced party acted in good faith believing that the right had been abandoned."  Id.  Inasmuch as the Guarantor Defendants did not know that PGP was

delinquent in the payment of franchise fees—due to McPherson failing to inform them of such or their own failure to inquire—they have no basis to assert they "believ[ed] that the right had been abandoned." Laches does not bar enforcement of the guaranties.

The Guarantor Defendants also urge that Plaintiff's failure to terminate the franchise agreements in 2006 or 2007 amounts to failure of Plaintiff to mitigate its damages. They assert that Plaintiff created more damages by extending the franchise agreements by ten years. However, as noted above, the period of approximately fifteen months between the funding of the DAN in November 2006—from which PGP was apparently brought current on its obligations to Plaintiff—and the sending of the notices of default in February 2008 cannot be said to be an unreasonable period of time. Moreover, the Guarantor Defendants could have protected their own interests by being diligent in keeping apprised of the affairs of the business entities whose obligations they had agreed to guaranty rather than signing whatever documents were placed in front of them without requiring any reports as to the performance of the business; they may not avoid repaying Plaintiff by now arguing that *Plaintiff* "failed to mitigate." Plaintiff is entitled to summary judgment on Count VIII.

5. Amount of Damages

Plaintiff has submitted a breakdown of franchise fees owed along with the Declaration of Jacqueline Bertet. The Court has reviewed the documentation in support of Plaintiff's damages calculation and, except for one clerical error as noted below, finds that the documentation supports the amount claimed by Plaintiff.

The outstanding Royalty Fees and National Advertising Fees are summarized in Ms. Bertet's Declaration and supported by the "Custom Account Status Report" submitted

therewith.  (Bertet Decl. ¶¶ 24-25; Ex. 2 to Bertet Decl.)  These amounts are as follows:

| Office | Franchise Fees |
|---|---|
| 1 | $108,851.17 |
| 2 | $4,295.00 |
| 3 | $45,855.04 |
| 7 | $54,037.50 |
| 9 | $67,156.23 |
| 10 | $40,805.94 |
| 12 | $33,690.95 |
| 13 | $90,587.43 |
| 20 | $32,689.95 |
| 21 | $35,711.73 |
| 22 | $26,794.06 |
| 23 | $26,300.60 |
| 24 | $57,430.80 |
| 25 | $53,000.30 |
| 26 | $1,212.00[12] |
| 27 | $50,680.49 |
| 28 | $1,452.00 |
| 29 | $47,234.07 |

---

[12]The amount listed in Bertet's Declaration for the franchise fees for Office Number 26 is $1,229.15.  (See Bertet Decl. ¶ 24).  However, the amount listed in the Custom Account Status Report for the "Customer Location Subtotal" for Office 26 is $1,212.00.  It appears that the $1,229.15 figure was mistakenly taken from a few lines further down on the Custom Account Status Report; this figure represents the audit royalty fees for Office 27 rather than the Subtotal for Office 26.  The Court has used the $1,212.00 figure from the Custom Account Status Report rather than the $1,229.15 figure from the Bertet Declaration.

| | |
|---|---|
| 31 | 17,342.87 |

| | |
|---|---|
| TOTAL | $795,128.13[13] |

Plaintiff has also established the liability of the Guarantor Defendants for the DAN principal of $600,000.[14] Thus, the total of franchise fees and DAN principal is $1,395,128.13.

### III. Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that Plaintiff's Motion for Partial Summary Judgment Against Defendants Robert C.E. Williams, Jimmy Aviram, and Michael Weber (Doc. 88) is **GRANTED**. Plaintiff has established entitlement to judgment in its favor on Counts VII and VIII of the Second Amended Complaint (Doc. 75) against Defendants Robert C.E. Williams, Jimmy Aviram, and Michael Weber as set forth herein.

Because this Order pertains to only two counts of the Second Amended Complaint and other counts remain pending, no judgment shall be entered at this time. Plaintiff has indicated that in the event this motion for partial summary judgment is granted, it will not pursue its other claims. Accordingly, **on or before Wednesday, February 24, 2010,** Plaintiff shall inform the Court whether it intends to pursue any of the other counts or its claim for

---

[13]Because of the $17.15 discrepancy noted earlier with regard to the franchise fees for Office 26, this total differs from the total submitted by Plaintiff by $17.15.

[14]The DAN provides for the accrual of interest upon acceleration of the note. (See Ex. T to Doc. 75, at 1 ("In the event Maker or Co-Maker(s) fail to make any payment when due, including any payment due upon acceleration of this Note, the entire outstanding Principal shall thereafter bear simple interest . . . from its due date until paid in full.")). However, Plaintiff has not requested an award of interest on the DAN principal, and no such award will be made.

liquidated damages and whether its "Motion for Leave to Amend Joint Pretrial Stipulation and Pretrial Brief" (Doc. 105) is moot. If Plaintiff does not intend to pursue any other claims, Plaintiff shall further advise as to whether any Defendant objects to dismissal of any of the remaining claims.

**DONE** and **ORDERED** in Orlando, Florida this 17th day of February, 2010.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party